**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MAXON, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FUNAI CORPORATION, INC.,<br><br>Defendant. | Case No. 1:16-cv-7685<br>(Coordinated lead case 1:16-cv-06840)<br><br>Hon. Gary Feinerman |

## OPPOSITION TO MOTION TO DISMISS

For many years, service providers dictated to consumers what services would be enjoyed on which of the consumer's devices through the service provider's centralized management of device services. Maxon, LLC's four patents reverse this conventional relationship between service provider and consumer, teaching a consumer how to control delivery of services such as Netflix to her various devices through a decentralized, distributed means of services management.

The patent claims and specification teach exactly how the consumer can achieve this control. First, the device (for example, a Sanyo TV) must have stored in it a unique device ID, a Netflix username and password corresponding to the consumer's account that is shared among the user's personal network of devices, and a method that allows the Sanyo TV to communicate with a common address of Netflix. Second, the TV must have logic that can receive commands from its owner whether she wants Netflix on this TV. Third, the TV must have a processor that can write out directions to Netflix, specifying, for example, that its owner wants to enjoy her Netflix account on this Sanyo TV. And, fourth, the TV must have a transceiver that sends the directions out to Netflix and receives the directions back from Netflix after Netflix has executed

the directions of the TV owner written by the TV.

All of Maxon's claims are patent eligible under 35 U.S.C. § 101. The claims and the specification are themselves a blueprint showing the public how the consumer can take control of what content will be seen or heard on what device. As demonstrated below, Funai Corporation, Inc.'s motion to dismiss should be denied. Funai utterly ignores the claim language and written description setting forth how the consumer may control her content on her personal network of devices.

**Standard of Review**

The standard of review on a motion to dismiss like Funai's is familiar: "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact) . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).[1]

**The Well-Pled Facts**

What follows are the well-pled facts—that is, a description of each of the illustrative patent claims alleged in the complaint, as well as Maxon's allegations regarding how the claims read on Sanyo TVs. Maxon will also emphasize portions of the specification that teach how a consumer may control content on a device according to the invention.

1. Claim 8 of U.S. Patent No. 8,989,160 (the "'160 patent") is to "[a]n audio-video device capable of sharing services with a plurality of other devices within a personal network[,]" such as a smart TV capable of sharing the owner's Netflix service with other devices. (Dkt. 1

[1] Furthermore, Maxon attached its patents to the complaint. (Dkt. 1 (Compl.) ¶¶ 7, 10, 13, 16.) Therefore, the patent claim language is part and parcel of the complaint and should be construed in Maxon's favor. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

(Compl.) ¶ 9.) This TV has four parts: storage, input/output logic, a processor, and a transceiver.

a. The storage of claim 8 of the '160 patent houses a device id, a username and password for access to the TV owner's personal network (e.g., Netflix), and a credential that unlocks a connection path between the TV and Netflix (Dkt. 1 (Compl.) ¶ 9(a)):

> a computer-readable medium having storage for a first address corresponding to the audio-video device, a second address corresponding to the personal network, and a third address corresponding to a service provider network . . . .

(*Id.*, Ex. A ('160 patent), col. 14:34-39.) The written description details the device ID, network ID, and credential and how they are used to allow a consumer to control the content she views on the Sanyo TV. (*See, e.g.*, *id.*, Ex. A ('160 patent), col. 5:26-64, 6:62-64 ("[T]he ESN **220**, PNC **222** and the data payload **240** are communicated to the subscriber database **134** where the personal network profile is stored.").)

b. The input/output logic of claim 8 is in the TV so that the TV may receive instructions from its owner on whether she would like Netflix on the TV or not (Dkt. 1 (Compl.) ¶ 9(b)):

> input/output logic configured to receive from a user a desired change to a service capable of being provisioned to the audio-video device from at least one service available generally to the personal network . . . .

(*Id.*, Ex. A ('160 patent), col. 14:40-43.) The input/output logic is taught in the specification as well. (*See, e.g.*, *id.*, Ex. A ('160 patent), col. 7:4-30 (". . . The user creates the payload **240** through manipulation of the input output logic **208** associated with the network device **110**. . . ."); *see also id.*, Ex. A ('160 patent), col. 7:31-56 (describing how user may communicate

desired change to the service provider after the TV is registered).)[2]

c. The processor of claim 8's TV prepares data that represents the TV owner's choice ("I do not want Netflix on this TV") (Dkt. 1 (Compl.) ¶ 9(c)):

> the processor programmed to prepare an inbound signaling word comprising at least the first address and payload data representing the desired change to the service capable of being provisioned to the audio-video device from the personal network . . . .

(*Id.*, Ex. A ('160 patent), col. 14:44-50.) "The processor **204** can also be in data communication with display logic **206** and input/output logic **208**." (*Id.*, Ex. A ('160 patent), col. 5:17-20; *see also id.*, col. 6:7-9, 6:31-7:30.)

d. The transceiver in claim 8's TV can communicate with Netflix about its owner's decision to deactivate Netflix on the TV (Dkt. 1 (Compl.) ¶ 9(d)):

> the transceiver further receiving an outbound signaling word comprising the first address corresponding to the audio-video device and data indicating the desired change to the personal network, the outbound signaling word responsive to the desired change to the service capable of being provisioned to the audio-video device from the personal network.

(*Id.*, Ex. A ('160 patent), col. 14:57-64.) The transmission of the directions to activate or deactivate a service is also taught in the specification. (*See, e.g.*, *id.*, Ex. A ('160 patent), col. 6:31-7:3 (". . . Regardless of the means in which the ISW **310** is initiated, the result includes transmission of the ISW **310**. In the illustrated example, the ISW **310** transmits from the personal network **104**, through the communications medium **120-124**, to the service provider's network

---

[2] The specification also teaches the threshold step of registering the device with the service provider network. "Registration of each network device **110** may be accomplished either remotely or locally using either manual or automated means. Registration of each network device **110** can include the creation or modification of data fields within subscriber database **134**, and authentication and authorization database **130**." (*Id.*, Ex. A ('160 patent), col. 6:4-8.)

**102**. The service provider's network **102** receives the transmission and logic (not shown) decodes the ISW **310** into its component data fields. . . .").)

    2.  Claim 6 of U.S. Patent 7,489,671 (the "'671 patent") could also be a smart TV—this one set up with the ability to command changes within the Netflix servers. (Dkt. 1 (Compl.) ¶ 12.) The TV of claim 6 has three parts: storage, management logic, and a processor:

    a.  The storage of claim 6 of the '671 patent stores a device id, as well as a username and password for access to the TV owner's personal network (e.g., Netflix) (Dkt. 1 (Compl.) ¶ 12(a)):

> a first computer-readable medium having stored thereon a first unique identifier that uniquely identifies the communications device within the communications network identified by the network number . . . .

(*Id.*, Ex. B ('671 patent) col. 14:1-4; *see also, e.g.*, *id.*, Ex. B ('671 patent), col. 5:26-64, 6:62-64.)

    b.  The management logic of claim 6 is in the TV so that the TV may dictate its owner's instructions on whether he would like Netflix on the TV or not. (Dkt. 1 (Compl.) ¶ 12(b), Ex. B ('671 patent), col. 14:7-19; *see also, e.g.*, *id.*, Ex. B ('671 patent), col. 6:31-7:30.)

    c.  The processor of claim 6's TV controls the management logic so that the TV may associate itself as, for example, activated within the owner's Netflix account (Dkt. 1 (Compl.) ¶ 12(c)):

> a processor that controls the management logic to update the database to reflect the addition of the communications device to the communications network, to disassociate in the database the one or more communications services from a second communications device if the one or more communications services are determined to be connected in the database to the second communications device, and to connect in the database the one or more communications services to the communications device by relating in the database the unique identifier that

> uniquely identifies the communications device and the data representing the one or more communications services.

(*Id.*, Ex. B (‘671 patent), col. 14:20-32; *see also* Ex. B (‘671 patent), col. 5:17-20, col. 6:7-9, 6:31-7:30.)

3. Claim 6 of U.S. Patent No. 7,486,649 (the “‘649 patent”) could also be a smart TV; this one set up with the ability to command changes within the Netflix servers. (Dkt. 1 (Compl.) ¶ 15.) The TV of claim 6 has three parts: storage, management logic, and a processor:

a. The storage of claim 6 of the ‘649 patent stores a device id, as well as a username and password for access to the TV owner’s personal network (e.g., Netflix) (Dkt. 1 (Compl.) ¶ 12(a)):

> a first computer-readable medium having stored thereon a first unique identifier that uniquely identifies the communications device within the personal network identified by the personal network number . . . .

(*Id.*, Ex. C (‘649 patent) col. 14:19-27; *see also*, *e.g.*, Ex. C (‘649 patent), col. 5:26-64, 6:62-64.)

b. The management logic of claim 6 is in the TV so that the TV may dictate its owner’s instructions on whether he would like Netflix on the TV or not (Dkt. 1 (Compl.) ¶ 15(b)):

> a management logic that manages a database containing routing information for an incoming communication directed at the personal network via the personal network number to be routed to a particular communications device within the personal network based on communications service content of the incoming communication, where the routing information relates the communications device to one or more communication services available to the personal network from a communications services provider by associating the first unique identifier that uniquely identifies the communications device to one or more communications services . . . .

(*Id.*, Ex. C (‘649 patent), col. 14:28-41; *see also*, *e.g.*, Ex. C (‘649 patent), col. 6:31-7:30.)

   c. The processor of claim 6's TV controls the management logic so that the TV may associate itself as, for example, activated within the owner's Netflix account (Dkt. 1 (Compl.) ¶ 15(c), Ex. C ('649 patent), col. 14:42-55; *see also*, *e.g.*, Ex. C ('649 patent), col. 5:17-20, col. 6:7-9, 6:31-7:30.)

  4. Claim 8 of U.S. Patent 7,171,194 (the "'194 patent") could also be a smart TV. (Dkt. 1 (Compl.) ¶ 18.) The TV of claim 8 has two parts: a user interface and logic in communication with the interface:

   a. The TV of claim 8 includes a graphical user interface and hardware, software, and firmware that allow the TV to run applications such as Netflix (Dkt. 1 (Compl.) ¶ 18(a)):

> a user interface configured to enable a user to select a service available to but not associated with the device . . . .

(*Id.*, Ex. D ('194 patent) col. 14:42-44; *see also id.*, Ex. D ('194 patent) col. 6:22-7:30.)

   b. The logic in communication with the graphical user interface of claim 8 allows the TV to dictate its owner's instructions on whether she would like Netflix on the TV or not (Dkt. 1 (Compl.) ¶ 18(b)):

> logic in communication with the user interface configured to format a signaling word responsive to the user's selection, wherein the signaling word comprises a unique identifier that uniquely identifies the device among others sharing the common network address, and payload data configured to associate the service to the device via the unique identifier.

(*Id.*, Ex. D ('194 patent), col. 14:45-51; *see also, e.g.*, *id.*, Ex. D ('194 patent), col. 6:31-7:3.)

## Argument

**I. Maxon claims patentable subject matter because through the claims and specification Maxon teaches the public how to grant the consumer control over delivery of services on the consumer's various devices.**

"A patent may be obtained for 'any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1347 (Fed. Cir. 2016) (quoting 35 U.S.C. § 101). The Supreme Court long ago held that the statute contains an important exception: laws of nature, natural phenomena, and abstract ideas are not patentable: "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

In *Mayo*, the Court held that a two-part test identifies patents that claim nothing more than a patent-ineligible concept like an abstract idea. First, the Court should "determine whether the claims are directed to one of those patent-ineligible concepts [i.e., natural phenomena, law of nature, or abstract idea]." *Alice Corp. Pty., Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (citing *Mayo*, 132 S. Ct. at 1296-97).

If the Court concludes that the claim is directed to an abstract idea, for example, then the Court should ask, "[w]hat else is there in the claims before us?" *Id.* (quoting *Mayo*, 132 S. Ct. at 1297) (internal quotations omitted). "To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98). "We have described step two of this analysis as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept]

itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

Here, the patent claims are directed to the abstract idea of reversing a trend of centralized service management, allowing the consumer to control through decentralized management the services that the consumer chooses to enjoy across her various devices. Similar to the claims in *BASCOM* and distinguished from the cases Funai relies on, Maxon's claims are patent eligible because the claims and specification show *how* to achieve the novel result of granting control of services to the consumer.

**A. Maxon's claims are directed to the idea of a consumer controlling content enjoyed on the consumer's various devices.**

In a recent case arising in the computer science arts like this one, the Federal Circuit distilled step one of the § 101 analysis as follows: "[T]he first step in the Alice inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database) or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).

Here, the asserted claims are directed to a device that the consumer may manipulate to share services. (Dkt. 1 (Compl.) ¶ 9(a), Ex. A ('160 patent), col. 14:32-34 (claim 8); *id.*, Ex. B ('671 patent), col. 13:65-67 (claim 6); *id.*, Ex. C ('649 patent), col. 14:15-17 (claim 6); *id.*, Ex. D ('194 patent), col. 14:40-41 (claim 8).) The device claimed allows the owner to control services by including, among other things, a memory and the ability to communicate with the service provider. (*See, e.g.*, *id.*, Ex. A ('160 patent), col. 14:35, 14:51-52 (". . . a computer-readable having storage . . . a transceiver providing the inbound signaling word to the service provider network . . . .").)

Applying the *Enfish* analysis, the Maxon claims are directed to the idea of the device

owner controlling delivery of services, and the claims invoke known computer components to deliver the result of owner control over services. This was a novel idea in the era of centralized services to a single device.

**B. Maxon's claims are patent eligible because rather than claim the result of consumer control over delivery of services, the claims and the specification teach *how* to achieve this novel result.**

These claims are patent eligible because the claims and written description specify *how* to achieve the idea of granting a consumer control of the services delivered to her network of personal devices. As such, this case is similar to *BASCOM*, 827 F.3d at 1352, where the court of appeals reversed the district court's grant of a motion to dismiss based on § 101.

There, the claims were directed to the abstract idea of filtering content to users of the Internet. *BASCOM*, 827 F.3d at 1348. In granting the motion to dismiss, the district court had reasoned that the claims could not amount to an "inventive concept" because the claims included only generic computing components. *Id.* at 1349. The Federal Circuit reversed: "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* at 1350. The claims in *BASCOM* were held to be patent-eligible because the claims were not drawn simply to the result of filtered Internet content, but rather taught how to achieve a novel result (albeit with known components): "The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a

local computer and the benefits of a filter on the ISP server." *Id.*[3]

Maxon's claims cover a specific implementation of the idea that a consumer may control what services play on her devices as opposed to a service being configured for a specific device. At the outset of the written description, Maxon states the idea as follows: "Generally speaking, one embodiment of a system and method is provided to enable a user to define, control and operate a personal network of one way or bi-directional devices capable of accessing a service provider's network, receiving services, or both." (Dkt. 1 (Compl.) ¶ 9(a), Ex. A ('160 patent), col. 3:37-41.) Critically, Maxon then details *how* (the requirements and the steps) to program the computing elements to achieve this result. (*Id.*, col. 4:36-7:56.)

The claim language also teaches how to deliver control of services to the owner of the device. "An audio-video device . . . comprising . . . a computer-readable medium having storage . . . input/output logic configured to receive from a user a desired change to a service capable of being provisioned to the audio-video device . . . the processor programmed to prepare an inbound signaling word . . . a transceiver providing the inbound signaling word to the service provider network . . . ." (Dkt. 1 (Compl.) ¶ 9(a), Ex. A ('160 patent), col. 14:32-64.) "A communications device . . . comprising . . . a first computer-readable medium having stored thereon a first unique identifier . . . a management logic that manages a database containing routing information . . . where the routing information relates the communications device to one or more communications services . . . a processor that controls the management logic to update the database to reflect the addition of the communications device . . . ." (*Id.*, Ex. B ('671 patent), col.

---

3 *See also DDR Holdings, LLC v. Hotels.com Ltd. P'ship*, 773 F.3d 1245, 1258 (Fed. Cir. 2014) (affirming holding that claims were patent eligible: "[T]he claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink.").

13:65-14:32.)

"A communications device . . . comprising . . . a first computer-readable medium having stored thereon a first unique identifier . . . a management logic that manages a database containing routing information . . . where the routing information relates the communications device to one or more communications services . . . a processor that controls the management logic to remove the communications device from the personal network . . . ." (*Id.*, Ex. C ('649 patent), col. 14:15-55.) "A device . . . comprising . . . a user interface configured to enable a user to select a service . . . logic in communication with the user interface configured to format a signaling word responsive to the user's selection . . . and payload data configured to associate the service to the device via the unique identifier." (*Id.*, Ex. D ('194 patent), col. 14:40-51.)

Funai ignores the teachings of the specification and claim language identified above. Perhaps because those teachings distinguish this case from the cases on which Funai relies.

In *Affinity Labs of Texas, LLC v. DirecTV, LLC*, --- F.3d ---, 2016 WL 5335501, *1 (Fed. Cir. Sept. 23, 2016), for example, the claims found patent ineligible were directed to a cellular phone that could stream out-of-market content. "The claim simply recites the use of generic features of cellular telephones, such as a storage medium and a graphical user interface, as well as routine functions, such as transmitting and receiving signals, to implement the underlying idea." *Id.* at *7. "There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself." *Id.* at *3 (emphasis added). Here, in contrast, Maxon goes beyond implementing consumer control of services on a generic computer, and instead teaches *how* the device may be programmed to store information about itself and its owner's services, and *how* to communicate with the service provider to activate and deactivate services shared across multiple devices within her personal

network.

The patent claims were also held ineligible for failure to teach *how* in *Nextpoint, Inc. v. Hewlett Packard Co.*, Case No. 15 C 08550, 2016 WL 3181705 (N.D. Ill. June 8, 2016). There, the claims were directed to management of litigation documents, such as electronically-stored information. The district court dismissed the amended complaint: "[T]he specification describes nothing more than the routine use of generic computing devices, languages, and protocols to accomplish well-known ESI management activities." *Id.* at *2. Funai assiduously avoids any discussion of Maxon's specification or claim language. As set forth above, the specification and claim language particularly teach *how* to reach the claimed result of controlling delivery of services to devices—distinguishing this case from *Nextpoint*. *See id.* at *4 ("Contrary to plaintiff's argument that the '731 Patent describes 'a specific manner of processing electronic litigation documents,' neither the specification nor the claims themselves identify a 'specific' processing method.")

Funai focuses on the patents' definitions of various terms and argues that the sheer breadth of the definitions makes the claims ineligible. (*See, e.g.*, Br. at 7, 9.) Funai, however, reads these definitions out of the context of the specification and claim language that specifically teach *how* a device may grant control of delivered services to the consumer. If Funai were to analyze the specification and claim language, it would see the error in arguing things like "the claims preempt mail delivery by the U.S. Postal Service[,]" (*id.* at 7), and "the term 'signal' is literally broad enough to encompass smoke signals . . . ." (*Id.* at 9.)

Attention to the claims and specification would also clean up inaccurate statements like this one: "The term 'payload data' is nowhere defined nor is a specific example even exemplified." (*Id.* at 9-10; *compare, e.g.*, (Compl.) ¶ 9(a), Ex. A ('160 patent), col. 6:64-66

("The logic used to control and manipulate the subscriber database **134** decodes the data payload **240** of the ISW **310**.").)

## Conclusion

Maxon respectfully requests that the Court enter an order denying Funai's motion to dismiss.

Date:  November 21, 2016

*/s/  Matthew M. Wawrzyn*
Matthew M. Wawrzyn (#6276135)
*matt@wawrzynlaw.com*
Stephen C. Jarvis (#6309321)
*stephen@wawrzynlaw.com*
WAWRZYN & JARVIS LLC
233 S. Wacker Dr., 84th Floor
Chicago, IL 60606
(312) 283-8010

*Counsel for Maxon, LLC*

**CERTIFICATE OF SERVICE**

I, Matthew M. Wawrzyn, an attorney, hereby certify that on November 21, 2016, a true and correct copy of the foregoing **Opposition to Motion to Dismiss** was filed using the Court's CM/ECF system, thereby serving a copy of the same on all counsel of record.

*/s/ Matthew M. Wawrzyn*