UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| MAXON, LLC, | ) | | |
| | ) | | |
| Plaintiff, | ) | 16 C 7685 | |
| | ) | | |
| vs. | ) | Judge Gary Feinerman | |
| | ) | | |
| FUNAI CORPORATION, INC., | ) | | |
| | ) | | |
| Defendant. | ) | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Maxon, LLC brought this suit against Funai Corporation, Inc., alleging infringement of four patents teaching electronic means of increasing user control over subscription entertainment content. Doc. 1. This suit has been coordinated for pretrial proceedings with four others brought by Maxon alleging infringement of the same patents. Doc. 13; *see Maxon, LLC v. LG Electronics U.S.A., Inc.*, 16 C 6840 (N.D. Ill. filed June 29, 2016); *Maxon, LLC v On Corp US, Inc.*, 16 C 6841 (N.D. Ill. filed June 29, 2016); *Maxon, LLC v. Panasonic Corp. of N. Am.*, 16 C 6843 (N.D. Ill. filed June 29, 2016); *Maxon, LLC v. Vizio, Inc.*, 16 C 6846 (N.D. Ill. filed June 29, 2016). Funai has moved to dismiss this suit under Federal Rule of Civil Procedure 12(b)(6) on the ground that the patents are invalid under 35 U.S.C. § 101, as interpreted by *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014). Doc. 21. The motion is granted.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information

1

that is subject to proper judicial notice," along with additional facts set forth in Maxon's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Maxon as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016).

Maxon is the exclusive owner of the four asserted patents: U.S. Patents 8,989,160 ('160), 7,489,671 ('671), 7,486,649 ('649), and 7,171,194 ('194). Doc. 1 at ¶¶ 7, 10, 13, 16. The complaint identifies a representative claim for each patent. *Id*. at ¶¶ 9, 12, 15, 18. Maxon alleges that the claims are directed to technology supporting "Smart TVs," meaning televisions with the capacity to connect to the internet and interact with streaming services such as Netflix. *Ibid*. These are the four representative claims:

> '160 Claim 8: An audio-video device capable of sharing services with a plurality of other devices within a personal network, the audio-video device comprising:
>
> a *computer-readable medium* having storage for a first address corresponding to the audio-video device, a second address corresponding to the personal network, and a third address corresponding to a service provider network;
>
> input/output *logic* configured to receive from a user a desired change to a service capable of being provisioned to the audio-video device from at least one service available generally to the personal network;
>
> a *processor* in communication with the computer-readable medium and the input/output logic, the processor programmed to prepare an inbound signaling word comprising at least the first address and payload data representing the desired change to the service capable of being provisioned to the audio-video device from the personal network; and
>
> a *transceiver* providing the inbound signaling word to the service provider network where the service provider network comprises logic to process the inbound signaling word including modifying stored information in a subscriber database to effect the desired change to the service capable of being provisioned to the audio-video device from the personal network, the

transceiver further receiving an outbound signaling word comprising the first address corresponding to the audio-video device and data indicating the desired change to the personal network, the outbound signaling word responsive to the desired change to the service capable of being provisioned to the audio-video device from the personal network.

'671 Claim 6: A communications device capable of sharing a network number with other communications devices in a communications network, the communications device comprising:

    a first *computer-readable medium* having stored thereon a first unique identifier that uniquely identifies the communications device within the communications network identified by the network number, where the first unique identifier that uniquely identifies the communications device is not a telephone number;

    a management *logic* that manages a database containing routing information for an incoming communication directed at the communications network via the network number to be routed to a particular communications device within the communications network based on communications service content of the incoming communication, where the routing information relates the communications device to one or more communication services available to the communications network from a communications services provider by associating the first unique identifier that uniquely identifies the communications device to the one or more communication services; and

    a *processor* that controls the management logic to update the database to reflect the addition of the communications device to the communications network, to disassociate in the database the one or more communications services from a second communications device if the one or more communication services are determined to be connected in the database to the second communications device, and to connect in the database the one or more communication services to the communications device by relating in the database the unique identifier that uniquely identifies the communications device and data representing the one or more communications services.

'649 Claim 6: A communications device that shares a personal network number with other communications devices within a personal network, the communications device comprising:

    a first *computer-readable medium* having stored thereon a first unique identifier that uniquely identifies the communications device within the personal network identified by the personal network number, where a second communications device within the personal network comprises a second computer-readable medium having stored thereon a second unique identifier

3

that uniquely identifies the second communications device within the
personal network identified by the personal network number;

a management *logic* that manages a database containing routing information
for an incoming communication directed at the personal network via the
personal network number to be routed to a particular communications device
within the personal network based on communications service content of the
incoming communication, where the routing information relates the
communications device to one or more communication services available to
the personal network from a communications services provider by
associating the first unique identifier chat uniquely identifies the
communications device to the one or more communication services available
to the personal network from the communications services provider; and

a *processor* that controls the management logic to remove the
communications device from the personal network including modifying the
database to unrelate the one or more communication services available to the
personal network from the communications device and relate the one or
more communication services available to the personal network to the
second communications device by changing the database to disassociate the
first unique identifier that uniquely identifies the communications device and
the one or more communication services available to the personal network
and associate the second unique identifier that uniquely identifies the second
communications device with the one or more communication services
available to the personal network.

'194 Claim 8: A device that is capable of sharing a common network address
with other devices, the device comprising:

a *user interface* configured to enable a user to select a service available to
but not associated with the device; and

*logic* in communication with the user interface configured to format a
signaling word responsive to the user's selection, wherein the signaling word
comprises a unique identifier that uniquely identifies the device among
others sharing the common network address, and payload data configured to
associate the service to the device via the unique identifier.

Doc. 1-1 at 17 ¶ 8; Doc. 1-2 at 16 ¶ 6; Doc. 1-3 at 17 ¶ 6; Doc. 1-4 at 17 ¶ 8 (emphases added).

The claims can be described as containing the following elements: '160 Claim 8 includes (1) a

computer-readable medium, (2) input/output logic, (3) a processor, and (4) a transceiver; '671

Claim 6 and '649 Claim 6 contain (1) a computer-readable medium, (2) management logic, and (3) a processor; and '194 Claim 8 contains a (1) a user interface and (2) communications logic.

Maxon alleges that Funai sells televisions that directly infringe on these claims. Doc. 1 at ¶¶ 9, 12, 15, 18. It seeks reasonable royalties and interest. *Id*. at 10-11.

## Discussion

As noted, Funai contends that the Maxon patents are invalid under *Alice*. The Federal Circuit has made clear that an analysis of patent eligibility may focus on particular representative claims. *See Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("The district court … correctly determined that addressing each claim of the asserted patents was unnecessary … because all the claims are substantially similar and linked to the same abstract idea.") (internal quotation marks omitted). The only claims cited in Maxon's complaint are the four claims set forth above and discussed below, and Funai argues in its opening brief that those claims are representative. Doc. 21-1 at 7-8. Maxon does not respond to this contention, thus forfeiting the point. *See Affinity Labs of Tx., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1256 n.1 (Fed. Cir. 2016) ("[T]he parties agreed at the hearing before the magistrate judge that claim 1 was representative. In light of that concession and Affinity's failure to present any meaningful argument for the distinctive significance of any claim limitations other than those included in claim 1, we treat claim 1 as representative of all the claims.") (internal quotation marks omitted); *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted).

Under 35 U.S.C. § 101, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013). Funai argues that Maxon's patents are directed to an abstract idea without an underlying inventive concept, and thus fail to claim patentable subject matter. Doc. 21-1 at 8-20. Under *Alice* and *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the patent eligibility inquiry has two steps. First, the court "determine[s] whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. If so, then the court considers the elements of each claim "both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Ibid*. In the second step, the court searches for "an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Ibid*. (internal quotation marks and brackets omitted).

## I. *Alice* Step One

As noted, *Alice* step one requires the court to determine whether the claims are directed to an abstract concept. Because "[t]he Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry," the appropriate analysis "compare[s] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). There is no need to conduct that analysis here because Maxon concedes that "the patent claims are directed to the abstract idea of reversing a trend of centralized service management, allowing the consumer to control through decentralized management the services

that the consumer chooses to enjoy across her various devices." Doc. 30 at 9. The court accordingly will proceed to *Alice* step two.

## II.     *Alice* Step Two

*Alice* step two requires the court to "determine whether the claims do significantly more than simply describe the abstract method." *Affinity Labs*, 838 F.3d at 1262 (brackets omitted). The court must "look to see whether there are any additional features in the claims that constitute an inventive concept, thereby rendering the claims eligible for patenting even if they are directed to an abstract idea," and those additional features "must be more than well-understood, routine, conventional activity." *Ibid.* (internal quotation marks omitted). As noted, the court considers the elements of the contested claims both "individually and as an ordered combination" to determine if an inventive concept lies within. *Alice*, 134 S. Ct. at 2355 (internal quotation marks omitted). Maxon contends that the representative claims, although directed at an abstract concept, nonetheless combine to create an inventive concept in that they teach *how* to achieve the result of decentralized service management. Doc. 30 at 10-14.

### A.     The Individual Elements of the Representative Claims

The court will begin with '160 Claim 8, the elements of which are illustrative. The claim has four elements: a "computer-readable medium"; "logic"; "a processor"; and a "transceiver." Each element is subject to limitations; for example, the claim is not for *any* computer-readable medium, but for one with storage for addresses of an audio-video device, a personal network, and a service provider network. Similarly, the logic must be capable of receiving a desired change in service from a user (*e.g.*, "add Netflix to this TV"). The processor must be able to communicate with the logic and the computer-readable medium to prepare a signal representing

7

the desired change in service. And, finally, the transceiver must send and receive signals to and from the service provider.

The "computer-readable medium" element is not, by itself, inventive. The '160 patent's specification defines "computer-readable medium" as "any non-transitory medium that participates directly or indirectly in providing signals, instructions and/or data to one or more processors for execution." Doc. 1-1 at 11. As examples, the specification offers media such as disks, magnetic tape, "any other optical medium," punch cards, "any other physical medium with patterns of holes," and "any other medium from which a computer, a processor or other electronic device can read." *Id*. at 11-12. The only specific attribute of the medium is storage for "addresses" that correspond to devices and networks. The specification defines the term "address" as "includ[ing] but … not limited to one or more network accessible addresses, device identifiers, telephone numbers, IP addresses, url and ftp locations, e-mail addresses, names, a distribution list including one or more addresses, network drive locations, postal addresses, account numbers or other types of addresses that can identify a desired destination or device." *Id*. at 11. Given the breadth of these definitions, the computer-readable medium cannot be described as inventive; in plain English, it could be described as "something that stores data that a computer can read." As *Alice* its progeny make clear, components used only for "basic [computer] functions" are not inventive, and information storage falls into this category. *Alice*, 134 S. Ct. at 2359; *see also Content Extraction*, 776 F.3d at 1345, 1348 (noting that the concept of "storing information" is not inventive).

Nor is the "logic" element inventive. The element is an "input/output logic" that can "receive from a user a desired change to a service capable of being provisioned to the audio-video device from at least one service available generally to the personal network." Doc. 1-1 at

8

17 ¶ 8. The specification defines "Logic" as including, but not limited to, "hardware, firmware, software and/or combinations of each to perform a function(s) or an action(s), and/or to cause a function or action from another component." Doc. 1-1 at 12. Thus, the logic element merely describes (again, rephrased in plain English) "some means of receiving a desired change in available services." It does not describe *how* this result is accomplished, only that it *is* accomplished. That is not inventive. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("[The claim at issue] contains no restriction on how the result is accomplished. The mechanism for maintaining the state is not described.").

The "processor" element must communicate with the first two elements—the computer-readable medium and the logic—in order to prepare a signal to be sent to the service provider indicating the desired change of service. Doc. 1-1 at 17 ¶ 8. That is not inventive. Because the specification does not define the processor, the court is left to conclude that it is a generic processor. The functions described in the processor element are likewise generic; it simply processes data to reach a result. The use of conventional processors to carry out conventional processing tasks is not inventive. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1320 (Fed. Cir. 2016) (describing a patent claim that featured generic processing equipment as non-inventive); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016) (holding that computer components carrying out "well-understood, routine, activities previously known to the industry" are not patentable) (brackets omitted).

The final claim element, the "transceiver," is not inventive, either. As with the processor, the specification does not define the transceiver, so the court assumes that it is generic. The claim describes the transceiver as both providing an inbound signal to the service provider network indicating a desired change of service, and receiving an outbound signal responsive to

the initial request. As with the other three elements, this, by itself, is not inventive; rather, it is merely a generic component performing its generic role, which in this case is sending and receiving signals. *See Mortg. Grader, Inc. v. First Choice Loan Servs.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) ("[S]ending information over [a] network is not even arguably inventive.") (internal quotation marks omitted); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (same).

'194 Claim 8 differs slightly from '160 Claim 8; rather than claiming three or four elements (medium, logic, processor, transceiver), it instead claims only a "user interface" and "logic." The "user interface" is not defined, so again the court assumes that Maxon intends a generic user interface, with the only limitation being that it is "configured to enable a user to select a service available to but not associated with the device." Doc. 1-4 at 17 ¶ 8. That merely takes a generic piece of technology and describes a result well within its normal functions, which is not inventive. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015) ("[An] interactive interface limitation is a generic computer element."). And the claim's "logic" element has the same flaws as the logic element of '160 Claim 8—it is defined in purely functional terms, and thus describes nothing more than achieving a result, without any limitation as to how the result is achieved.

In sum, the individual elements of '160 Claim 8 and '194 Claim 8 are not, by themselves, inventive. The same holds true for the individual elements of '671 Claim 6 and '649 Claim 6; although the claim language of each differs slightly from that of the '160 patent, the differences are immaterial and the relevant definitions are the same. *Compare* Doc. 1-2 at 10, 16 ¶ 6 ('671 patent) *and* Doc. 1-3 at 11, 17 ¶ 6 ('649 patent) *with* Doc. 1-1 at 11-12, 17 ¶ 8 ('160 patent). The

core problem remains that each element of the representative claims describes generic technology functioning in a generic manner, which is not inventive.

B. **The Ordered Combination of Elements**

Because none of the individual elements is inventive, the inventive concept must be found in an ordered combination of these elements, if it is to be found at all. Maxon contends that the ordered combination of elements is inventive because the claims, while directed to an abstract concept and using generic technology, nonetheless teach *how* to achieve the concept using that technology. Doc. 30 at 10-14. Maxon is incorrect.

As shown above, each claim element represents a currently available generic computer technology, used in the way in which it is commonly used. The computer-readable medium is essentially memory, operating as it typically does. The logic is defined purely in functional terms, making the element little more than "something that can do what it is asked to do." The processor processes, while the transceiver sends and receives signals.

'160 Claim 8 contains all four elements, in that order, which purport to amount to "[a]n audio-video device capable of sharing services with a plurality of other devices within a personal network." Doc. 1-1 at 17 ¶ 8. Translating the claim language into plain English, the invention consists of some kind of memory capable of identifying the device and the networks to which it is connected, the ability to take instructions from a user concerning the device's capabilities, a processor that can take those instructions and use them in connection with the stored identification data, and the ability to send and receive signals based on the processor's activities. That describes only the desired result—increased user control over services available to him or her—without describing any *inventive* way that the result is reached. The only method of reaching the result the patent teaches is, in essence, use of generic computer components for their

standard purposes to achieve the result. Nothing about the order of the elements, or the way they are combined, suggests inventiveness. *See Virginia Innovation Sciences Inc. v. Amazon.com, Inc.*, ___ F. Supp. 3d ___, 2017 WL 64147, *12-13 (E.D. Va. Jan. 5, 2017) (describing as non-inventive a claim that did no more than describe a result to be achieved using generic elements operating in their typical manner).

The same holds for '671 Claim 6 and '649 Claim 6. Those claims consist of a device comprising a computer-readable medium, management logic that directs a database containing routing information, and a processor controlling the logic to modify the database to add or remove devices from a network. Again, this amounts to a description of generic computer components reaching a functional result to achieve an abstract concept, without any suggestion that the interaction of the components is anything but conventional. The same is true of '194 Claim 8. The user interface and logic are generic components, and are combined in a very simple, standard way: the user interface allows a user to give instructions to a device, and the logic interprets those instructions. This is basic computer organization and functionality, which is not inventive. *See Intellectual Ventures*, 792 F.3d at 1370 (holding that a description of generic computing components with an instruction to do nothing more than "apply [the abstract concept] on a computer" does not confer patent eligibility).

This result comports with that reached in *Virginia Innovation Sciences Inc. v. Amazon.com, Inc.*, *supra*, which held that claims directed toward compression technology for converting video images on a mobile device screen to those appropriate for television are patent ineligible. 2017 WL 64147 at *12-13. One of the claims at issue in that case was:

> a means for processing the video signal to produce a converted video signal for use by the alternative display terminal, wherein processing by the means for processing the video signal includes converting the video signal from a compression format appropriate for the mobile terminal to a display format for

12

> the alternative display terminal that is different from the compression format, such that the converted video signal produced by the means for processing the video signal comprises a display format and a power level appropriate for driving the alternative display terminal.

*Id*. at *12 (brackets omitted). The court explained that "[t]he claim does not specify the power level or the conversion method, aside from the fact that the signal is compressed. … [T]he purportedly novel [invention] … describes an end[] that could be performed in any number of ways by a variety of devices." *Id*. at *13. The same is true here; the representative claims essentially describe a functional result, without any suggestion as to any inventive technological means of achieving that result. *See Internet Patents Corp.*, 790 F.3d at 1348 ("[The claim] contains no restriction on how the result is accomplished. The mechanism for [accomplishing the result] is not described, although this is stated to be the essential innovation.").

Maxon contends that three recent decisions support a finding of patent eligibility here: *Bascom Global Internet Services v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); *Enfish*, 822 F.3d at 1327; and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In each case, the Federal Circuit reversed a district court's decision that a particular patent was directed to patent ineligible subject matter. All three cases are distinguishable.

*DDR Holdings* addressed a patent directed toward a particular e-commerce system in which a website visitor clicking on an embedded advertisement is directed to a different website, with the "look and feel" of the first website, where she could purchase the advertised product. 773 F.3d at 1249-50. Noting that the patent's claims did not "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the internet," but instead claimed solutions "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," *id*. at 1257, the Federal Circuit held that the claims were directed to something more than an abstract

13

concept. *Id*. at 1259. As the court explained, by "incorporat[ing] elements from multiple sources in order to solve a problem faced by websites on the Internet," the claims "amount[ed] to an inventive concept …, rendering the claims patent-eligible." *Ibid*. *DDR Holdings* thus addressed a situation where the concept itself was not abstract and where, in any event, the specific combination of claim elements resulted in an inventive solution to a problem specific to the internet. By contrast, for Maxon's patents, the concept is concededly abstract, and the problem (how to improve consumer control over services) is not unique to computers and the internet. *See Affinity Labs*, 838 F.3d at 1261-62 (distinguishing *DDR Holdings* on the ground that the claims in *DDR Holdings* were directed to a "novel" challenge rather than fundamental or longstanding principles and practices, and were directed to the solution of a technological problem improving computer/network functionality).

*Enfish* concerned a patent covering a "self-referential database," which taught a means of configuring data in a computerized table to improve searchability and organization. 822 F.3d at 1333, 1337. The district court held that the claims were directed toward "the [abstract] concept of organizing information using tabular formats." *Id*. at 1337. The Federal Circuit reversed, holding that this view of the claims did not consider their specificity and how they operated to improve computer functionality in practice. *Id*. at 1338. Reasoning that "the self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory," the court held that "the claims are directed to a specific implementation of a solution to a problem in the software arts … [and] are not directed to an abstract idea." *Id*. at 1339. Like *DDR Holdings*, then, *Enfish* upheld the validity of the challenged patent at *Alice* step one, not step two.

The claims in *Bascom* were directed to an abstract concept, filtering internet content, so the Federal Circuit had to reach *Alice* step two. 827 F.3d at 1349. The court held that although the limitations within the patent were "well-known generic computer components," they were combined in such a way as to be inventive. *Id*. at 1349-50. Specifically, while the filtering tool itself was not inventive, its *location* within the system described was inventive because it permitted a user to obtain "both the benefits of a filter on a local computer and the benefits of a filter on the ISP server." *Id*. at 1350.

The patent in *Bascom* described both a technical problem (a lack of customizability in internet filtering arising from where filtering technology was installed) and a technical solution to that problem (locating the filtering software at a point in the system that would allow greater customizability). *Ibid*. By contrast, the claims in Maxon's patents attempt to solve not a technical problem, but rather the broader conceptual problem of increasing user control over various services. And the proffered means of solving that problem is not the kind of technical solution taught by the patent in *Bascom*—using known computer components in an innovative way—but rather simply a suggestion that a user of services should be able to communicate with service providers using technological, not conventional, means.

*Alice* and its progeny stand for the proposition that a patent teaches patentable subject matter only if it offers a specific technical solution to a specific technical problem, not if it offers a sweeping recitation purporting to patent the concept of solving an abstract problem through generic technical means. *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016) (describing *Bascom* as distinguishing "ineligible abstract-idea-based solutions implemented with generic technical component in a conventional way" from "eligible technology-based solution[s] and software-based invention[s] that improve the performance of

15

the computer system itself") (internal quotation marks and brackets omitted); *Synopsis, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1152 (Fed. Cir. 2016) ("Unlike the claims in *DDR Holdings* and *Bascom*, the Asserted Claims do not introduce a technical advance or improvement."); *Virginia Innovation Sciences Inc.*, 2017 WL 64147, *15 (noting that in *Bascom*, "each one of the steps in the 'ordered combination' was specific, and their organization created a narrow solution to a computer-centric problem"). Despite their extensive verbiage, when stripped to their core, Maxon's patents fall on the wrong side of the line. They are directed to the abstract concept of increasing user control over services. They do not solve a specific technical problem in this field, but instead offer only the notion of using generic computer components for their generic purposes in order to achieve a result, without describing any inventive way that the result is achieved. This fails *Alice* step two, meaning that the patents claim patent-ineligible subject matter and are invalid under § 101. It necessarily follows that Maxon's infringement claims must be dismissed.

## Conclusion

Funai's motion to dismiss is granted. Because the patents are directed at subject matter that is not patent eligible as a matter of law, leave to amend would be futile, so the dismissal is with prejudice. *See Snowcast Solutions, LLC v. Endurance Specialty Holdings, Ltd.*, 2016 WL 1161299, *6 (N.D. Ill. March 23, 2016).

May 23, 2017

United States District Judge